July 3, 2026

**Supreme Court**

No. 2024-384-C.A.
(P1/22-825AG)

State                :

v.               :

Juan Rivera.         :

NOTICE: This opinion is subject to formal revision before publication in the Rhode Island Reporter. Readers are requested to notify the Opinion Analyst, Supreme Court of Rhode Island, 250 Benefit Street, Providence, Rhode Island 02903, at Telephone (401) 222-3258 or Email opinionanalyst@courts.ri.gov, of any typographical or other formal errors in order that corrections may be made before the opinion is published.

State                    :

v.                       :

Juan Rivera.            :

Present: Suttell, C.J., Robinson, Lynch Prata, Long, and Flaherty (ret.), JJ.

# O P I N I O N

**Chief Justice Suttell, for the Court.** The defendant, Juan Rivera, appeals from a judgment of conviction after having been found guilty of (1) first-degree murder, (2) conspiracy, (3) discharge of a firearm when committing a crime of violence, (4) possession of a firearm by a person prohibited from doing so, (5) carrying a firearm without a license or permit, and (6) felony assault and/or battery. On appeal, the defendant assigns three claims of error to the trial justice: (1) she erred in finding that the state properly authenticated certain surveillance footage; (2) she erred in allowing hearsay testimony under the "good faith" exception set forth in Rule 804(c) of the Rhode Island Rules of Evidence; and (3) she erred in allowing a witness to testify about "the word on the streets." This case came before the Supreme Court, sitting at North Smithfield High School, for oral argument on April

2, 2026.  For the reasons set forth in this opinion, we affirm the judgment of the Superior Court.

## I

## Facts and Travel[1]

On Saturday morning, September 25, 2021, Julio Castro went to Roque's Café on Broad Street in Providence (the café) for breakfast, as was his daily routine. While he was there, he saw Jorge Garcia enter the restaurant.  Garcia arrived with his employer, Arturo Walker, between 7:45 and 8:00 a.m.  The two were there for breakfast, as they had been doing every Saturday that summer, before going to work setting up "[b]ouncy houses" for multiple parties that day.  Castro had known Garcia since he was around fourteen or fifteen years old; however, he had not seen Garcia for years prior to that morning, and he did not know Walker.  Castro and Garcia said "[w]hat's up to each other[,]" and had a friendly exchange.

About two weeks before this encounter, defendant, who was also a friend of Castro, had inquired about Garcia to Castro.  Specifically, defendant had asked Castro if he knew Garcia.  Castro told defendant that he knew him and asked why defendant was asking.  The defendant informed Castro that he wanted to speak to Garcia "[a]bout sending him drugs * * *."  When Castro saw Garcia at the café, he

---

[1] We recite only those facts necessary to provide context for the issues raised by defendant in this appeal.

texted defendant "and asked him if he wanted [Castro] to speak to [Garcia]." The defendant replied "[n]o, leave it at that."

While Castro was texting defendant, Garcia was still in the café sitting at a table near Castro. Castro remained at the café and made "[s]mall talk" with Garcia as he finished his breakfast. Once he finished, Castro ordered takeout to bring to the mother of his child.

Walker thought nothing of the conversation between Garcia and Castro; he explained at trial that "[t]hey were just saying hi like they were normal friends." As the two conversed, Walker ordered his breakfast and sat down. Walker and Garcia ate their food while Castro eventually got up and left the café.

When Walker and Garcia finished their meal, they walked to the counter to return their plates, and Walker placed an order for oatmeal to go. They remained at the counter, which was close to the door of the establishment, while they waited to receive their bill and the oatmeal, which Walker said took longer than usual that day. Walker then described what happened next:

> "I was sitting down and all I hear was one shot. And I believe the first shot he missed because it hit the fridge. I think there's a fridge behind [Garcia] because that's all I remember. All I hear was one shot. I went blind -- I went deaf. And when I got up, [Garcia] was on the floor bleeding out."

Video surveillance captured from multiple angles at the café that morning depicted a person walking up to the door of the restaurant 8:56 a.m.,[2] opening the door, pulling out a gun and shooting Garcia. The individual was wearing a black sweatshirt with the hood up and white lettering on it.

Garcia was brought to Rhode Island Hospital, where he was pronounced dead at 12:21 p.m. that same day. The manner of death was determined to be homicide caused by multiple gunshot wounds.

At about the same time as the shooting occurred, Castro "dropped the food off" at the home of his child's mother and quickly left for work as a mechanic at his garage. While he was on his way, he received a call from an employee of the café informing him that Garcia "had got killed[,]" which caused Castro to turn around "to go see what happened." He then received another phone call, this time from defendant, who sounded "out of breath"; defendant said "[t]hat they were going to catch him." Castro hung up the phone. He received yet another call, this time from his close childhood friend, Josue Calderon, who informed Castro that defendant "had did some crazy shit."

Walker called emergency services after the shooting, and the Providence police arrived at the café around 9 a.m. Detective Theodore Michael was one such

---

[2] There is a three-minute offset between the time displayed on the surveillance footage capturing the shooting and the actual time of day. The surveillance footage indicates the shooting occurred at 8:53 a.m.

officer who arrived at the scene. Detective Michael, who had in 2010 become a computer forensic examiner with the Providence police, testified that he had participated in the investigations of "[o]ver a hundred murders and thousands of major crimes" in his time working as a detective, out of which he had led "[h]undreds" of those investigations. He testified that he started out in "computer forensics" before moving on to "cellular forensics"—meaning he examined "mobile phones, tablets, [and] iPads * * *." Eventually, Det. Michael also began to work on "digital DVR forensics * * *." He noted that he frequently participates in trainings to maintain his skills because "[a]s the digital forensic field moves, you have to move with it, and if you don't, you're going to get behind the eight ball." Based on Det. Michael's extensive career in the field of digital forensics, the state proffered him as an expert witness in digital forensics evidence. There was no objection and the trial justice allowed him to testify as an expert.

Detective Michael offered that, on the morning of the shooting, he was able to immediately determine that the café had a "DVR system" that contained a hard drive, and he was also able to conclude that the DVR system was operational because he was "able to play back and see the incident at hand." He then established that the cameras were "motion-based[,]" meaning that the system would record and save video footage when it detected motion. Utilizing an application to which he had access through the United States Secret Service, Det. Michael was also able to reach

the conclusion that the time tracked on the video was three minutes behind the actual time of day. He testified that he seized the entire DVR system at the café to perform a "forensically sound examination" of the hard drive at the police station. He took the hard drive of the DVR system from the café to a locked facility on the third floor of the Providence police station. Detective Michael also testified that when he examined the video footage stored on the hard drive it was in "a read-only format," which he explained means that "[he] can't add anything to it and * * * if [he] didn't like something, [he] can't cut it." He additionally affirmed that he did not manipulate the video footage in any way.

The video footage from the café's hard drive was offered as state's exhibit 22, which Det. Michael testified was a fair and accurate representation of what he had retrieved on the morning of the shooting. Exhibit 22 consisted of surveillance footage from all the cameras located in or around the café, of which there were eleven. The footage included recordings from both the interior and the exterior of the café.

At trial, defendant objected to the admission of that video evidence based on a lack of an adequate foundation. The jury was excused, and defense counsel argued that no one had testified that "the video system was capturing what it was capturing at the time." He additionally argued that, despite Det. Michael's testimony that the DVR system was motion-based, there was footage recorded where no one was

moving. Further, he submitted that there was no documented evidence showing the chain of custody of the hard drive. Finally, he claimed that no eyewitness had testified to confirm the video footage was accurately depicting what had occurred at the time of the recording.

The prosecutor responded by noting that the state had a "very slight" burden to authenticate video evidence pursuant to Rule 901 of the Rhode Island Rules of Evidence, and she cited *O'Connor v. Newport Hospital*, 111 A.3d 317 (R.I. 2015), for support. She further argued that the state met that "slight burden[,]" under *State v. Pulphus*, 465 A.2d 153 (R.I. 1983), because Det. Michael testified the evidence had not been altered, he provided his expert testimony on how the cameras were activated, he determined the offset between the actual time of day and the time portrayed on the surveillance footage, and he also testified as to the chain of custody. She further stated that the state would later proffer eyewitnesses who could also authenticate the content of exhibit 22. She characterized defendant's arguments as "fodder for cross-examination" that went to credibility rather than admissibility. The trial justice agreed with the state, determining that an adequate foundation had been laid, and she allowed exhibit 22 to be admitted into evidence.

In addition to exhibit 22, the state also offered exhibits 24(A), 24(B), and 24(C). Exhibit 24(C) included surveillance footage from the café already contained in exhibit 22; exhibits 24(A) and 24(B) also included surveillance footage and

depicted several different locations tracking the movements of the shooter before and after the shooting. Defense counsel objected to the admission of exhibits 24(A)-(C) based on the same grounds of his previous objection to exhibit 22. The trial justice inquired about this objection, asking "[a]re you objecting to other portions other than what was set forth in [e]xhibit 22 that may be part of this [e]xhibit 24?" Defense counsel then clarified by responding, "Your Honor, we originally objected to these videos because it contained a portion of [exhibit] 22, Your Honor. So we're just going to renew the same objection that we made earlier." The trial justice overruled that objection, and exhibits 24(A)-(C) was admitted in full.

Based upon the video footage in exhibits 24(A) and 24(B), the police were able to determine how the shooter arrived at the café on the morning of September 25, 2021. They viewed a red Toyota with a black hood rendezvous with a black Dodge Ram that was parked on Booth Street. The driver of the black Dodge Ram exited his vehicle and then entered the passenger side of the red Toyota. The red Toyota then drove to Wiggins Village. The two occupants exited from the vehicle and "walk[ed] through the rear yards of Wiggins Village towards a fence that leads to Roque's Caf[é]." Both of the men hopped over the fence and ended up near a McDonald's. At that point, the driver of the red Toyota turned back and returned to the driver's seat of that vehicle, while the eventual shooter continued walking. The

shooter, wearing a "black hoodie with * * * white lettering," proceeded to the café, shot Garcia, and then fled back to the red Toyota parked at Wiggins Village.

The police were able to zoom in on the video footage of the black Dodge Ram and capture a license plate number, which indicated it was registered to defendant. However, the police were unable to obtain clear footage of the license plate on the red Toyota. As a result, on October 1, 2021, the police disseminated an e-mail asking officers to be on the lookout for a red Toyota with a black hood that had been involved in a homicide. The next day, on October 2, 2021, an officer reported that she had previously taken a domestic report on or about September 19, 2021, where the complaining witness, Isamarys Segura, stated that her boyfriend, Calderon, was in possession of a red Toyota with a black hood. At that point, the police focused their inquiry on defendant and Calderon.

Castro testified that defendant had expressed concern that there were warrants out for defendant's arrest and that defendant and Calderon needed to flee to Florida. Segura testified that, as of October 5, 2021, Calderon was no longer in possession of the red Toyota and that he had explained to her that defendant "was going to sell the car for him." That statement came in without any objection. For reasons not clear from the record, Calderon passed away later that month; his funeral was held on October 23, 2021.

Later at trial, defense counsel attempted to undermine the credibility of Segura as a witness by asking her, "And everything you learned about this case, you learned from the street, isn't that correct?" She responded, "Yes, that's correct." On redirect, the prosecutor asked Segura, "Well, based on the knowledge that you have from the streets, was [Castro] involved in the conspiracy to kill [Garcia]?" to which she responded "[n]o." At that point, defense counsel objected on the basis of speculation, which the trial justice overruled because he had "opened up the door." Segura was then asked by the prosecutor, "Based on what you know from the streets, who was involved with the murder of [Garcia]?" Segura named only defendant in response.

The defendant's jury trial lasted from March 6, 2024, to March 15, 2024, at the conclusion of which defendant was found guilty of all counts brought against him. On July 2, 2024, defendant received two life sentences, to be served consecutively, for the murder of Garcia (count one) and for the discharge of a firearm when committing a crime of violence (count three). He additionally received ten years for conspiracy (count two), ten years for illegally possessing a firearm (count four), ten years for carrying a firearm or pistol without a license or permit (count five), and six years for felony assault and/or battery (count six)—all to be served concurrently with his life sentence on count one. This appeal followed.

- 10 -

## II

## Standard of Review

"It is a basic principle that the determination of whether an out-of-court statement meets an exception to the hearsay rule is within the trial justice's discretion." *State v. Aponte*, 317 A.3d 745, 749 (R.I. 2024) (quoting *State v. White*, 296 A.3d 692, 701 (R.I. 2023)). "A trial justice's ruling will be upheld unless abuse of discretion that prejudices the complaining party is shown." *Id.* (brackets omitted) (quoting *White*, 296 A.3d at 701). However, the determination of whether the statement of an unavailable witness is testimonial pursuant to *Crawford v. Washington*, 541 U.S. 36 (2004), is reviewed *de novo* by this Court. *See State v. Feliciano*, 901 A.2d 631, 642 (R.I. 2006).

"When an issue concerning the admission or exclusion of trial evidence is properly preserved for appellate review, this Court employs an abuse of discretion standard of review." *State v. Esdel*, 317 A.3d 756, 766 (R.I. 2024) (quoting *State v. Doyle*, 235 A.3d 482, 493 (R.I. 2020)). "We have also stated that 'we will reverse a trial justice's ruling on the admissibility of evidence only where it constitutes a clear abuse of discretion.'" *Id.* (quoting *Doyle*, 235 A.3d at 493).

### III

### Discussion

On appeal, defendant argues that the trial justice first erred by admitting exhibits 22 and 24(A)-(C) into evidence because a proper foundation could not be laid to authenticate them without testimony from either a custodian or a percipient witness verifying the accuracy of the video footage. Additionally, defendant contends that two statements made by the now-deceased Calderon should not have come into evidence under the good-faith exception to the rule against hearsay because they were neither based upon personal knowledge, nor did they contain "indicia of reliability." Finally, defendant submits that the trial justice abused her discretion in determining defense counsel "opened up the door" for Segura to provide testimony about "the word on the streets" on redirect after he attacked her credibility on cross-examination. We discuss each issue raised *seriatim*.

### Authentication

Before beginning our discussion on whether exhibits 22 and 24(A)-(C) were properly authenticated, we first note that "we have said on innumerable occasions, a litigant cannot raise an objection or advance a new theory on appeal if it was not raised before the trial court." *State v. Cable*, 348 A.3d 1287, 1293 (R.I. 2026) (quoting *State v. Tavares*, 312 A.3d 449, 458 (R.I. 2024)). "Moreover, 'in order to satisfy the strictures of our raise-or-waive rule, an evidentiary objection must be

sufficiently focused so as to call the trial justice's attention to the basis for said objection.'" *State v. Barros*, 148 A.3d 168, 172 (R.I. 2016) (deletion omitted) (quoting *State v. Diefenderfer*, 970 A.2d 12, 30 (R.I. 2009)). "[W]e have declared that, 'although a defendant objected to the state's motion *in limine*, such an objection is not adequate to preserve [an] issue for appeal.'" *Cable*, 348 A.3d at 1293 (quoting *State v. Mensah*, 227 A.3d 474, 483 (R.I. 2020)). "As such, 'it is incumbent upon counsel to raise timely and appropriate evidentiary objections *throughout the trial* in order to preserve the issues for appeal.'" *Id.* (quoting *Mensah*, 227 A.3d at 483).

The defendant argues that "Rule 901 requires a witness with knowledge. But, the State presented no testimony from the custodians who produced the images [contained in exhibits 22 and 24(A)-(C)] and offered only Arturo Walker who, though a percipient witness, testified to only a portion of [e]xhibit 22, which was insufficient to authenticate the entirety of both exhibits." Thus, defendant is challenging the admission of both exhibits 22 and 24(A)-(C) in their entirety.

After a thorough review of the record, we are not satisfied that defendant preserved that broad contention to be considered on appeal. Before trial began, defendant presented a motion *in limine* seeking to exclude all surveillance footage regarding the September 25, 2021 incident. He did so on the basis that the videos were "cherry picked" and that "[a]s the videos have been manipulated, omitted and selectively chosen by the detectives, prior to them being provided to the defendant,

the surveillance videos should be excluded from the trial and the State should be prohibited from using them as evidence." Even if a motion *in limine* could properly preserve an issue on appeal, that argument submitted to the trial justice is fundamentally different from the lack of foundation argument presented before us. *See Cable*, 348 A.3d at 1293.

The defendant did properly object to the admission of exhibit 22 at trial, arguing that a percipient witness was necessary to authenticate the surveillance footage. However, the objection to exhibit 24(A)-(C) is more limited. Upon the state moving to admit that exhibit, defense counsel stated, "Your Honor, *based on our previous argument*, we renew our objection for the same reasons * * *." (Emphasis added.) The trial justice then sought clarification on defendant's objection, asking, "Are you objecting to other portions other than what was set forth in [e]xhibit 22 that may be part of this [e]xhibit 24?" The defense counsel responded, "Your Honor, we originally objected to these videos *because it contained a portion of 22*, Your Honor. So we're just going to renew the same objection that we made earlier." (Emphasis added.) Thus, defendant limited his objection with respect to exhibit 24 insofar as it contained the same footage as exhibit 22. In other words, as discussed *infra*, defendant's objection to exhibit 24 is limited to the contents of exhibit 24(C).

Exhibit 22 contains surveillance footage from all eleven cameras located in or around the café, whereas exhibit 24(C) contains select footage from channels[3] one, four, five, seven, and eleven.[4]  Furthermore, defendant's argument before us now is limited to the fact that the state presented neither a custodian nor a percipient witness for that footage.  The defendant, however, concedes that Walker properly authenticated channels four, seven, and eleven.  Therefore, the only argument that survives relative to exhibit 24(C) is a small portion of channels one and five, which were not authenticated by Walker.

We are satisfied that Det. Michael's testimony was sufficient to authenticate the surveillance footage of exhibit 22, and by extension, channels one and five of exhibit 24(C).  Rule 901 of the Rhode Island Rules of Evidence provides that "[t]he requirement of authentication or identification as a condition precedent to admissibility is satisfied by evidence sufficient to support a finding that the matter in question is what its proponent claims."  This Court has also stated that "the burden of proof for authentication, however, is slight." *Esdel*, 317 A.3d at 777 (brackets omitted) (quoting *State v. Mulcahey*, 219 A.3d 735, 739 (R.I. 2019)).  "Moreover, we have further held that it is the trial justice who 'must decide whether there is

---

[3] The images depicted on the surveillance footage are referred to by defendant as "channel 1" for camera one, "channel 2" for camera two, and so on.

[4] The trial testimony contains references to channel 121 within exhibit 22.  Exhibit 22 does not contain a channel 121.  Our review suggests that the reference to channel 121 is intended to reference channel 11.

enough support in the record to conclude that it is reasonably probable that the evidence is what its offeror proclaims it to be.'" *Id.* (quoting *Mulcahey*, 219 A.3d at 739). "Therefore, 'a trial justice need not find that the evidence is necessarily what the proponent claims, but only that there is sufficient evidence that the jury ultimately *might* do so.'" *Id.* (quoting *Mulcahey*, 219 A.3d at 739).

In *Pulphus*, we first recognized that images from automatic cameras may be used as substantive evidence rather than just demonstrative evidence. *Pulphus*, 465 A.2d at 157, 161. In that opinion, we provided some guidelines on how such evidence may be authenticated:

> "The foundation required for the admission of a photograph as a 'silent witness' is obviously different from the foundation required for demonstrative evidence. The party seeking to admit the photograph must be able to establish its competency and authenticity. In making this showing in a case such as this, where the photographs are taken by an automatic camera, the trial justice should look for reliable evidence that verifies the accuracy of the photograph. Such evidence includes but is not limited to (1) testimony that the photograph has not been altered in any significant respect, (2) testimony on how the camera was activated, (3) evidence of the time interval between frames, if applicable, (4) evidence of the date the photographs were taken, (5) the chain of custody of the film after its removal from the camera, and (6) testimony of a competent witness who can explain what the photograph portrays even though he was not present when the photograph was taken." *Id.* at 161.

In the case at bar, Det. Michael provided testimony on many of those points.

- 16 -

We begin by highlighting that in *Pulphus* we held that such evidence may be authenticated by the "testimony of a competent witness who can explain what the photograph portrays *even though he was not present* when the photograph was taken." *Pulphus*, 465 A.2d at 161 (emphasis added). Thus, we have not required that a percipient witness is necessary to authenticate videographic or photographic evidence. *See id.* Here, Det. Michael clearly testified that the DVR seized from the café was in a read-only format, which meant it could not be tampered with or altered. He testified, "[s]o we used a tool called DVR Examiner, and more or less it was -- it's a read-only. So what that means is I can't add anything to it and I can't -- if I didn't like something, I can't cut it." Detective Michael's suggestion that the video footage could not be tampered with provided ample evidence for the trial justice to determine a jury could reasonably conclude that the surveillance footage contained in exhibit 22 depicted what the state claimed it to be—that is, it is an accurate recording of the café on the morning of September 25, 2021—despite the fact Det. Michael was not an eyewitness. *See Esdel*, 317 A.3d at 777.

Although Det. Michael did concede that it may be possible to edit video footage in read-only format, he noted that he would not be able to do so despite his extensive training in digital forensics. Specifically, he related, "I'm sure it can be done. Not by me, but I'm sure there's somebody out there that can do it." Additionally, defendant has presented no developed argument that the surveillance

footage may have actually been tampered with. *Cf. Pulphus*, 465 A.2d at 162 ("However, there is no reason to believe, and Pulphus does not claim, that the photographic process was tampered with or that the photographs were distorted."). The defendant could not make such an argument because, in addition to testifying that he neither tampered with the footage nor was he able to, Det. Michael provided the chain of custody for the surveillance footage. Specifically, he stated that it has been in the possession of the Providence police since being seized at the café shortly after the shooting occurred. *Cf. id.* ("[T]he evidence establishes that the negatives were properly developed and maintained by a responsible business enterprise whose business it was to maintain them. In view of the record, we cannot say that the trial justice abused his discretion by admitting the photographs."). This testimony by Det. Michael limited, if not removed, the possibility that the footage was not representative of the café that fateful morning.

Likewise, we cannot say the trial justice abused her discretion in admitting exhibit 22 in its entirety, or the inclusion of channels one and five in exhibit 24(C), because it was "reasonably probable[,]" based on Det. Michael's expert testimony, "that the evidence is what [the state] proclaim[ed] it to be." *Esdel*, 317 A.3d at 777 (quoting *Mulcahey*, 219 A.3d at 739).

## Calderon Statements

The defendant next claims that the trial justice erred by allowing into evidence certain statements of Calderon, through the testimony of Castro and Segura, under the "good faith" exception of Rule 804(c) of the Rhode Island Rules of Evidence.[5] The two statements he seeks to exclude are (1) Castro's testimony that shortly after the shooting Calderon had told him that defendant "did some crazy shit" and (2) Segura's testimony that Calderon had told her that defendant "was going to sell the car for him."

The defendant originally moved to exclude any statements from Calderon in a motion *in limine* because, he argued, "the statements are inadmissible hearsay not covered by any hearsay exception." However, as previously noted, a motion *in limine* is not sufficient to preserve an issue for review on appeal and "it is incumbent upon counsel to raise timely and appropriate evidentiary objections *throughout the trial* in order to preserve the issues for appeal." *Cable*, 348 A.3d at 1293 (quoting *Mensah*, 227 A.3d at 483). Here, defense counsel failed to make contemporaneous objections to those statements when they were elicited at trial.

Regarding Castro's testimony, the record reveals the following:

---

[5] Rule 804(c) of the Rhode Island Rules of Evidence provides: "A declaration of a deceased person shall not be inadmissible in evidence as hearsay if the court finds that it was made in good faith before the commencement of the action and upon the personal knowledge of the declarant."

- 19 -

"Q  So you hung up with [defendant].  [Calderon] calls you.

"A  Yes.

"Q  Did [Calderon] call you on the normal number he used?

"A  Yes.

"Q  And he spoke to you?

"A  Yes.

"Q  And at that time, what did he say?

"A  He stated that he had did some crazy shit.

"Q  He said he did some crazy shit?

"A  That Juan did.

"Q  Did he use the name Juan?

"A  Yes."

Defense counsel failed to object to this testimony as it occurred.  The same is true regarding the testimony of Segura:

"Q  You testified earlier that [Calderon] drove a red Toyota Corolla.

"A  Yes.

"Q  And do you remember if he was still in the possession of that car that night, October 5th, 2021?

"A  No.

"Q  What did he tell you happened with the car?

"A  That he -- it disappeared. He was going to sell it.

"Q Did he say anybody was involved in its disappearance?

"A  Yeah.

"Q  Who?

"A  He said [defendant] was going to sell the car for him.

"Q  [The defendant] was going to sell the car for him.

"A  Yes.

"Q  So on October 5th he was no longer in possession of the car?

"A  No."

Because defense counsel failed to timely object when those statements were elicited, the trial justice was not alerted to the alleged error, and we cannot say that she abused her discretion in allowing those statements to come in. *See Barros*, 148 A.3d at 172. Therefore, defendant has waived any argument on appeal regarding those statements. *Id.*

## "The Word on the Streets"

Finally, defendant submits that the trial justice erred in overruling his objection regarding Segura's testimony on redirect examination about "the word on the streets."  In an attempt to, ostensibly, discredit Segura's testimony, by

highlighting that she had no direct personal knowledge about the facts of this case, defense counsel asked the following:

> "Q And everything you learned about this case, you learned from the street, isn't that correct?
>
> "A Yes, that's correct.
>
> "Q You have no personal knowledge of anything about this case, isn't that correct?
>
> "A That's correct.
>
> "Q Again, everything you learned you learned from the streets, not from personal knowledge, isn't that correct?
>
> "A Yes."

On redirect examination, the state began to inquire about the so-called "word on the streets":

> "Q Do you also remember a question on cross-examination that everything you know about what happened to [Garcia] you knew from the streets?
>
> "A Yes.
>
> "Q Based on that information, do you trust [Castro] still?
>
> "A Somewhat, yes.
>
> "Q Well, based on the knowledge that you have from the streets, was he involved in the conspiracy to kill [Garcia]?
>
> "A No.
>
> > "[Defense Counsel]: Objection, Your Honor. Speculation.

"THE COURT: Overruled. You opened up the door.

"Q Based on what you know from the streets, did [Castro] have anything to do with the conspiracy to kill [Garcia]?

"A No.

"* * *

"Q Based on what you know from the streets, who was involved with the murder of [Garcia]?

"A [The defendant]."

The defendant now argues that the trial justice incorrectly overruled his objection based on opening the door because his questions were focused on Segura's personal knowledge, whereas the state's questions on redirect exceeded that scope and allowed for the introduction of inadmissible hearsay.

We need not consider the merits of that argument. It is clear from the record that defense counsel did not object to the state's line of inquiry based on hearsay grounds; rather, he objected to the question of whether Castro was involved in the shooting based upon speculation. Because there was no specific hearsay objection raised at the time the statement was elicited, we once more hold that this line of argument has been waived. *See Barros*, 148 A.3d at 172 ("Moreover, 'in order to satisfy the strictures of our raise-or-waive rule, an evidentiary objection must be sufficiently focused so as to call the trial justice's attention to the basis for said objection.'") (deletion omitted) (quoting *Diefenderfer*, 970 A.2d at 30). Nor did

defense counsel raise any objection to the open-ended question posed to Segura as to whether she knew anyone involved in the shooting, to which she replied only the defendant. *See id.* (providing a litigant cannot raise new objections on appeal that were not preserved in the record below).

## IV

## Conclusion

For the reasons set forth herein, the judgment of the Superior Court is affirmed, and the record of this case shall be returned thereto.



# STATE OF RHODE ISLAND

## SUPREME COURT – CLERK'S OFFICE

Licht Judicial Complex
250 Benefit Street
Providence, RI  02903

## OPINION COVER SHEET

| | |
|---|---|
| **Title of Case** | State v. Juan Rivera. |
| **Case Number** | No. 2024-384-C.A. (P1/22-825AG) |
| **Date Opinion Filed** | July 3, 2026 |
| **Justices** | Suttell, C.J., Robinson, Lynch Prata, Long, and Flaherty (ret.), JJ. |
| **Written By** | Chief Justice Paul A. Suttell |
| **Source of Appeal** | Providence County Superior Court |
| **Judicial Officer from Lower Court** | Associate Justice Kristin E. Rodgers |
| **Attorney(s) on Appeal** | For State: <br><br> Brendan P. Sullivan <br> Department of Attorney General <br> For Defendant: <br><br> Richard J. Ratcliffe, Esq. |